October, 1858.

---

## SUPREME COURT.—HABEAS CORPUS.

---

IN THE MATTER OF FRANCIS DE FLANCHET OR FRANCHET, A PRISONER IN THE FORT.

A French seaman, one of the crew of a French ship, wrecked in the Arctic Ocean, was taken on board of an American whaleship, brought to the port of Honolulu, and was here shipped before the American Consul as boat-steerer on board the same vessel, and subsequently arrested by order of the American Consul as a deserter from the said vessel : Upon the petition of the Commissioner of France, he was brought before the Court on a writ of habeas corpus, claimed as a French subject, and alleged to be legally incapable, under the laws of France, of entering into the contract.

Held, that the mariner's relation to the vessel was dissolved *de facto* and by operation of law, when the master abandoned his ship as a hopeless wreck, and that the mariner was at liberty to enter into a new contract of shipment on board the American vessel.

Also, that the laws of France, admitting the seaman to be liable for a penalty under them for having enlisted on a foreign ship, can not have force to control the sovereignty or rights of any other nation within its own jurisdiction.

Municipal laws must always be restricted in their construction to places and persons upon whom the Legislature have authority and jurisdiction.
Penal laws are strictly local, but a different rule obtains in relation to contracts.

ALLEN, C. J.

This was a writ of habeas corpus to the Marshal of the Hawaiian Islands, commanding him to bring before the Court the body of Francis de Flanchet. This writ was issued on the petition of Emile Perrin, Consul of the Empire of France, at the Hawaiian Islands, who on oath alleges that said Flanchet, a French subject, and sailor lately serving on board the French whaleship "Napoleon III.," which was wrecked in the Arctic Ocean on the 20th day of May last, has been arrested and committed to prison, where he still remains, by the Police authorities, for the alleged offense of deserting from an American whaleship in the harbor of Honolulu, and that he is informed and believes that the said allegation is without foundation in fact, inasmuch as the said Flanchet never entered into any legal contract to serve on board said ship, and is not a deserter therefrom, and that the arrest and imprisonment of said Flanchet are illegal and unjustifiable in law ; that said petitioner, as such Consul, is the legal and only guardian of the rights and liberties of the said Flanchet, who is a native born French subject.

And the Marshal makes return on said writ as follows :

"By virtue of the within writ of *habeas corpus*, as Marshal of the Hawaiian Islands, I now bring the body of Francis de Flanchet or Franchet into Court."

"I make further return that I do not know whether he is a French sailor or not, and that he was arrested on the 30th day of October, A. D. 1858, and is now detained in the Prison under my custody by virtue of a warrant of arrest now in my hands, issued by Abner Pratt, United States Consul, residing at Honolulu, of which the following is a copy :

' Consulate of the United States of America, }
Honolulu, S. I., October 30, 1858. }

SIR :—Francis Franchet, of the crew of the American ship "Nassau," whereof H. Murdock is master, now in this harbor, has deserted in an improper and insubordinate manner, I would

request you to cause the said person to be arrested and imprisoned until I find it expedient to give him liberty.

    (Signed,)                               ABNER PRATT.

To W. C. Parke, Marshal of the Hawaiian Islands.'

"Being authorized and required so to do by the treaty of friendship, commerce and navigation between his Hawaiian Majesty and the United States, concluded and signed at Washington on the 20th day of December, 1849, and the Statute Laws of this Kingdom, defining my duties as Marshal, and I do hereby return this order complied with, this 5th day of November, 1858.

    (Signed,)               W. C. PARKE, Marshal H. I."

The writ of *habeas corpus* is a summary process. It requires the exercise of a sound discretion and a careful examination into all the circumstances of the case, which in this instance involves questions of great importance. The whole case has been very ably presented by the learned counsel to the consideration of the Court.

The petitioner's counsel contends that de Flanchet never entered into any legal contract to serve on board said ship "Nassau," and therefore could not be a deserter.

It is alleged that as the seaman did not read in detail the shipping articles, he could not have understood the contract, and therefore it is void. It is well known that these shipping articles are in perfect coincidence with the laws of the United States, and with the general principles of the maritime law, and there was no more need of his reading these articles any further than the terms of the contract were embodied, than there was of his reading the laws of the country applicable to the shipping contract under whose flag he proposed to sail. For when any stipulation is found in the shipping articles inconsistent with its provisions, unless it was clearly explained to the seaman, and agreed to by him for a consideration, it is void. He had been on board the ship five months, and had during this period become conversant with the rules and regulations and police of the ship—the material questions for him to settle were his compensation or lay, and the term of service. The evidence of the Clerk of the Consulate is, that these were clearly and distinctly understood by him. He expressly swears

that he explained to him the terms of shipment.   The lay was expressly stated, and the term of service, and the seaman was present when his name was entered on the shipping articles in accordance with the law of the United States.   All countries especially enjoin it as a consular duty to guard the seaman and protect him in his contracts and his rights.   They are accustomed to consider seamen as peculiarly entitled to their care and protection.   From the whole evidence I am satisfied that the seaman fully understood the conditions of the contract and agreed to them.

By the testimony of the master of the ship, it appears that there had been a conversation on the passage from the North, through the interpretation of Mr. Malee, the 2d officer of the " Napoleon III.," that Flanchet would ship on his arrival in Honolulu at the 75th lay.   He says that he made a bargain with the seaman, which was interpreted by Mr. Malee, and that the seaman gave his assent to it, and that in pursuance of that agreement he immediately went into the Consul's office with him, and he was then shipped in the manner as stated by Mr. Marshall.

De Flanchet says that when Capt. Murdock took him on board he agreed to pay him the same as he paid the others ; that there was an officer on board named Malee who interpreted to him what the Captain said.   He says that he thought that when Capt. Murdock took him to the Consulate it was to pay him, but he received nothing ; did not understand what they said at the Consulate, but knew on going out that he was shipped ; he then went on board the ship, and soon after came on shore and went to the French Consul's to tell him that he had been shipped, but that he had not been paid for the oil. He says further that he never made an arrangement with the Captain, Mr. Malee made it ; that witness never spoke to the Captain about any arrangement.   Mr. Malee told witness before he went up stairs at the Consulate that he was to ship, and he said let them pay me for the oil already taken first, and then he would see about it.   When in the office was asked his age, and he answered twenty-one.   He further says that he told Mr. Davis, at the Prison, that he could not go in the American vessel, that the French laws forbid it, but if he was free would like to go.

If on going out of the office he discovered that he was shipped without his knowledge, why did he not return immediately and correct the error, which the Consul would have done at once, on discovering that the man was shipped from a misunderstanding, and especially in cases where the seaman understands very little of the language. He says Malee told him when he was going to the Consulate he was to ship. So, it is very certain that when he went to the office the idea of shipping was on his mind, and that being the case, had he been disinclined to make the contract he would not have done anything about it. I cannot believe that Mr. Marshall was mistaken. It is very certain that it was a subsequent thought, after it was said to him that he incurred a penalty by the laws of France by shipping in a foreign vessel, for he told Mr. Davis that if he was free he should like to go on board the "Nassau." It is manifest that the subject of shipping on his arrival in Honolulu was familiar to his mind, and that Malee explained to him fully the terms of shipment before he went into the office of the Consul, and that while there the contract was clearly and fully explained to him.

Is it a reasonable bargain? The seaman gets the 75th lay as a boatsteerer, and that portion of the oil now on board of the ship as well as the future catchings. I regard this an equitable bargain, although it is not contended that the Master of the ship was under any legal obligation to pay him that proportion if he left the ship here. It is very clear that there was no disposition to drive a hard bargain. Had there been, I should have regarded the contract as liable to objection. But I am fully convinced that it is a favorable contract for the seaman, and that he fully understood it. The shipping articles are in the usual form, and regarded favorably by all parties. There is no condition but what is for the benefit of the seaman to regard, and could they be rigidly enforced, it would promote the health of the seaman and the success of the voyage. In addition, this seaman had been on board this ship for some five months; he had become acquainted with the rules and regulations of the ship; and what would be required of him on board, and had he not been willing to ship when, as he says, he thought they were shipping him, he would have declined to have discussed the terms and to have answered the necessary questions

for entry on the ship's papers, for it appears that the lay, or share, and the term of service were distinctly stated. His measure was taken, his age was asked and given, and his nation- ality, all which were properly entered on the shipping articles and crew list. Who can doubt then that he understood it? It is very easy for a seaman to understand his lay, and whether a voyage was for a season or till the ship went home. It is equally clear that he subsequently changed his mind—men very often, and very improperly, do this after they have made a con- tract. In view of all the evidence, I am satisfied he was legally shipped on board the "Nassau."

It is contended further that although he was legally shipped, he was not a deserter, and therefore ought to be discharged. The prisoner says that immediately after he left the Consul's office that he went on board and immediately returned on shore again and went to the French Consul's. He says he went to tell the French Consul that the Captain had shipped him. He says he applied to the Consul for clothes, which he gave him, and he further applied to the Consul to procure his clothes from the "Nassau," and two of his companions went on board to get his clothes, but the Captain refused to deliver them. The French Consul provided him with lodgings, where he remained one and a half days before he was arrested. He says "the French Consul visited me in prison—but he did not forbid me to go on board the ship 'Nassau,' but I know that the laws of France forbid me to go on board that vessel." He says further, that the Captain of the "Nassau" offered him $100. Mr. Davis testified that he had a conversation with the prisoner, and he said he could not go, as it was against the laws of France. He said it would subject him to thirty two months imprisonment. He said the Consul of the United States wished him to visit the prisoner and ascertain whether he wished to go in the vessel. The Captain of the "Nassau" asked the prisoner if he would like to go on his vessel if he were free, and he said yes, but said the French Consul told him that he must go on board a French whaler outside, or a man- of-war.

Let us examine the circumstances, and see if they do not evince a deliberate intention to desert. He left the ship and

went to the French Consul's and took the lodgings that he furnished, where he remained one and a half days. Sent to the "Nassau" for his clothes, but they were not delivered. He, in a conversation with the Captain of the "Nassau" and Davis, said that he could not go on board because it was against the laws of France. If he was free he would like to go. Mr. Davis went, at the special request of the United States Consul, to ascertain from the prisoner whether he wished to go in the vessel, and he said no, giving the same reason.

There is no evidence of the circumstances of his leaving the ship, whether he had permission or not, but he was absent one day and a half before his arrest. .

When it is clear, as in this case, that the seaman did not intend to return to the vessel, and having actually not returned, he was in contemplation of law a deserter. The Captain requests his return to the vessel and he declines; the Consul wishes to know if he will join the ship and he declines. He uses the same language to Mr. Davis, although this was subsequent to his arrest, still it carries the same intention, which it evinced in all his conduct on his coming on shore. Had the evidence been that he was willing to return to the ship and never declined to join her, he would clearly be entitled to his discharge. But the evidence clearly shows that he either went on shore with the intention not to return to *the ship*, or he decided upon this course soon after.

The statute of 1840, chap. 23, makes it the duty of Consuls and Commercial Agents of the United States "to reclaim deserters and discountenance insubordination by every means within their power ; and where the local authorities can be usefully employed for that purpose, to lend their aid and use their exertions to that end in the most effectual manner. In all cases where deserters are apprehended, the Consul or Commercial Agent shall inquire into the facts."

It appears that the Consul did inquire into the facts, and ascertained that he would not return to the vessel, and for a reason which operated on his mind before arrest, and that was, an apprehension that he would be punished by the laws of France for joining a foreign ship.

Francis de Flanchet.

It is further contended that although the prisoner has made a valid contract, and has deserted, that there is no legal warrant for his arrest and detention.

By the law of 1846 it was made the duty of the Prefect of Police to make diligent search for deserters from foreign vessels, and arrest them, due notice being given him, and if not returned to his vessel, shall be put at the disposal of his proper Consul, or Commercial Agent. And at this time there was no provision made for an especial mode or process of arrest, as the Prefect relied upon the Consul to inquire into the facts of the case, and see that justice was done. In 1847 the office of Marshal was created, and he became, *ex officio*, Prefect of Police.

In 1849 this Government made a treaty with the United States, in which it was stipulated "that the Consuls, Vice-Consuls, and Commercial Agents, are authorized to require the assistance of the local authorities for the search, arrest, detention and imprisonment of the deserters from the ships of war and merchant vessels of their country. For this purpose they shall apply to the competent tribunals, judges and officers, and shall, in writing, demand the said deserters, proving by the exhibition of the registers of the vessels, the rolls of the crews, or by other official documents, that such individuals formed part of the crews, and this reclamation being thus substantiated, the surrender shall not be refused."

It appears by this stipulation that the Consul shall apply to the competent tribunals, judges and officers, and shall, in writing, demand said deserters. In this case the Consul has done his duty by applying to an officer competent to make the arrest. Upon this application the Marshal makes the arrest in accordance with the usage which has always prevailed in this Kingdom.

It is undoubtedly within the discretion of either of the parties to the treaty to prescribe the tribunal or officer to which the Consul shall, in writing, address his demand for the deserter—but as this has not been done, he has pursued the usual course, and addressed his note to the Marshal. Suppose a tribunal was especially instituted, the Consul would be under no obligation to make oath to the facts on which a warrant should issue.

The magistrate must issue his warrant on this communication, which is not an affidavit upon which warrants are usually issued. The present mode is certainly much more convenient, and it is not contended that it is illegal unless made so by the 13th Article of the Constitution, which is in these words :

"Every person has the right to be secure from all unreasonable searches and seizures of his person, his houses, his papers, and effects, and no warrants shall issue, but on probable cause, supported by oath or affirmation, and describing the place to be searched, and the person or thing to be seized."

Regarding the terms of the treaty, no warrant based on an affidavit could be issued, for the Consul is authorized, in writing, to make a demand for the deserter, but an oath by him is not required.

Every person has a right to be secure from all unwarrantable seizures by the laws of the Kingdom, and our treaty stipulations regard the arrest of a deserter from a foreign ship as a duty and not as an unreasonable seizure. The law of 1846 was enacted, and the treaty stipulation was made prior to the Constitution, and as another of the same purport was passed in 1853, it is very clear that it was the intention of the framers of the Constitution to apply this peculiar mode of arrest and none other to persons attached to foreign ships. In addition, in the same year, a law was passed making it lawful for the Marshal so to arrest mutinous persons on board of any vessel of this nation, being within the jurisdiction of this Kingdom, upon written application made to the Marshal by any foreign Consul, Vice Consul or Commercial Agent.

In their legal condition seamen attached to foreign ships are differently situated from other persons. They are subject to the laws of the country from which they derive their flag, as well as liable for any violation of the local laws. They have their first examinations by the laws of their own country, which make it the duty of their Consuls in all cases where deserters are apprehended to inquire into the facts. Here is the first investigation by the Consul of the nation under whose flag he sails, and so far as the liberty of the person is concerned it may be regarded as a matter of universal law, as effective in protecting personal liberty, as the mode contended for by the

Consul.   In addition, the writ of habeas corpus is still open to him ; it will be seen, therefore, that the seaman is as fully shielded from any encroachment on his personal liberty as the people of the country, wherever he may be.   The arrest is made on the declaration of the Consul that the person is a deserter, proving by the exhibition of the register of the vessel, the rolls of the crew, and other official documents, that he formed part of the crew.   The officer has a right to demand of the Consul the inspection of these documents, but if he does not, it don't vitiate the arrest.   The design of this provision is to protect the officer, and should he arrest a person wrongfully who was not legally attached to a ship, he would be liable in damages.

It is further contended that by the parity clause of the French and Hawaiian treaty of 1846, that all the privileges that are given to natives of this Kingdom are claimed by the French Consul, and he claims to stand in the same relation towards French subjects on these islands, as the Governor does to natives, and that they cannot be enlisted without his authority; and that, therefore, the prisoner not having such authority, was not competent to make a valid and binding contract to serve on board the "Nassau," and claims his discharge by the tribunals under this treaty stipulation.

It is certainly the right and privilege of the subjects of the Empire of France to consult with the Consul of their nation in relation to the expediency of shipping, but was it intended to extend to him the power to control the subject in this particular as the Hawaiian laws do the natives ?   Is it a *civil right* that the subject has that the Consul shall control him ?   Is it a privilege ?   The parity clause in treaties has reference to favors, privileges and immunities.   It would be a singular construction of language under the parity clause of privilege to impose on the subjects of foreign nations, temporarily here, the restraints, the burthens and taxes, to which native subjects are subjected.   The native subject is liable for taxes, and is obliged to procure the approbation of the Governor before he can be permitted to ship on any foreign vessel, or before he

can leave the country. This provision of the law, however, does not apply to the naturalized foreigner—it is limited to the native.

By the argument of the learned counsel, these are privileges, and the French subject should *enjoy* them. It may be that the French Consul would like to enjoy the privilege of controlling French subjects to this extent, in this particular—but they would hardly regard it as a civil *right* or privilege to be obliged to obtain the permission of their Consul to make a contract as seamen. The parity clause in treaties is frequently subjected to ingenious application, but usually in favor of extending the rights and privileges of foreign subjects. But the practical application as contended for would not only transfer the protec-tection of the subject under the laws of this Kingdom to the Consul, but also empower the Consul to restrain the subject in the civil right of making a contract, and all this under the parity clause of right and privileges. It would invest the Consuls of the different countries with a power over the citizens and subjects of their countries which they represent, which has never been exercised or claimed by any nation. It would be an exercise of legal tyranny not contemplated by the framers of the treaty. The Hawaiian Legislature would be somewhat amazed to learn that in passing restrictive laws on native subjects, such for example as prohibiting the sale of liquors to natives, that this would be claimed by foreigners as one of the rights and privileges to which they were entitled.

Chancellor Kent says that treaties of commerce defining the rights and extent of commercial intercourse, have been found to be of great utility, and they occupy a very important title in the Code of National Law. They have multiplied exceedingly within the last century, but during this period no such claim by Consuls has ever been instituted over the subjects of a foreign country resident abroad.

By the French law, every Frenchman is free to abdicate his country. If they accept foreign citizenship, or enter into foreign service without leave, it evinces an intention never to return, and thereby they lose all their civil and political rights at home. They lose thereby their nationality, or civil and political rights as Frenchmen. Hence, by the French law the per-

fect freedom to emigrate and seek their own fortunes in their own way, if in accordance with the laws of the country where they are. The construction placed on the parity clause, therefore, is not in accordance with the perfect freedom of the French law, applicable to the subject abroad. In the case of the U. S. vs. Wingall, 5 Hill, N. Y. Reports, 16, it was held to be lawful to enlist aliens in the army of the United States, and the contract would be valid. There can be no doubt of the general principle of law, that any man has a right, who lands on these shores, to make a contract to serve on board of a vessel of any nation, so far as the law of the place is concerned, and that contract fairly and properly made is obligatory on the parties, unless the seaman makes it in derogation of a prior contract. By treaty stipulation deserters must be arrested and delivered up to the ship to which they are legally attached, and when a seaman has fraudulently shipped on board more than one vessel, the first in time would be the first in right.

It is contended further, by the learned counsel for the petitioner, that by the Marine Laws of France, 25th October, 1795: All sailors are subject to an inscription, and bound to serve on board national vessels, or in the national docks whenever required so to do. And by another article of March, 1852, any French sailor subject to the maritime inscription found on board of a foreign vessel, unless he have a permit from a French authority, or prove that his being on board was the result of circumstances beyond his control, shall be punished as therein provided.

The counsel further claims that, under this inscription, the prisoner's services are due to the Empire of France, and that he is incompetent to contract to serve on board any foreign vessel without the permit required by the 67th Article of the said law of 1852, and that therefore the alleged contract with the "Nassau" is void, and therefore the prisoner must be discharged.

That, by the comity of nations, the above law of France not being repugnant to, or at variance with, the laws of this Kingdom, is to be respected here.

It is not denied that the original contract by which de Flanchet was bound to the "Napoleon III.," was dissolved after the wreck was abandoned. The mariner's relation to the vessel is

dissolved *de facto*, and by operation of law, when the Master has abandoned the vessel, and authorized the crew to leave her. Hence it is, that persons having been attached to a ship which has been wrecked, and abandoned from necessity, may claim, as salvors, when their services exceed the proper duty as seamen, and when their connection with the ship in the capacity in which they shipped had been *de facto*, and by operation of law, dissolved. (The two "Catherines," 2 Mason, p. 319; The "Neptune," 1 Hogg Ad., 227, 237; Mason and Blenreau, 2 Cranch R., 240; Hobart *vs.* Dragon, 10 Peters Rep., 108, 122.)

It is very clear also that he joined the ship "Nassau" in the Arctic Ocean, after the wreck of the "Napoleon III.," from circumstances beyond his control.

There is no doubt that he could have legally left her on arrival in port, but he thought proper to complete a contract for the voyage, which had been somewhat discussed during the season, and thereby obtain his full proportion of the earnings of the ship while he was on board. How far the seaman would be answerable in France for joining a foreign ship under circumstances beyond his control, and continuing in her service under a contract which may be regarded as especially favorable to his interest, I will not attempt to give an opinion; but certain I am that the penalty could only be nominal. But admit him to be liable in France to a penalty under her laws, he is certainly not liable here by virtue of those laws. A penal law is strictly local, and can not have any operation beyond the jurisdiction of the country where it was enacted. The petitioner cannot expect this Court to enforce the criminal laws of another country, or aid in surrendering those who are accused of having violated those laws farther than is prescribed by international law, or required by the obligations of treaty. Lord Loughborough says "that the penal laws of foreign countries are strictly local, and affect nothing more than they can reach, and can be seized by virtue of their authority; a fugitive who passes hither comes with all his transitory rights, and cannot be affected in this country by proceedings against him in that which he has left, beyond the limits of which such proceedings do not extend." (1 H. Bl., 135.)

The laws of a nation cannot have force to control the sover-

eignty or rights of any other nation within its own jurisdiction. And however general and comprehensive the phrases used in the municipal laws may be, they must always be restricted in construction, to places and persons upon whom the Legislature have authority and jurisdiction. (The "Apollon," 88. 6 Curtis, U. S. Reports.)

This is a principle of law recognized in the jurisprudence of France, I am quite sure, as well as throughout the rest of the civilized world.

A different rule obtains in relation to contracts. Justice is to be administered in our Courts according to our laws and forms of proceeding, though the action be founded on a contract made in another State or country, the *lex loci* applying only to the construction and effect of the contract. Every country has its own modes of redress and judicial proceedings peculiar to its own jurisprudence. The *lex loci* has reference to the nature and construction of the contract, and its legal effect, and not to the mode of enforcing it. Justice demanded that this comity should exist between nations, and it has become incorporated into the Code of National Law in all civilized countries. (14 Johnson's Rep., Cowp., 343; 1 Johnson's Cases, p. 140 ; 1 Gallison's Rep., 371.)

What was the legal condition of Flanchet when he arrived within the limits of this Kingdom in the ship "Nassau?" If he was under no legal obligation to remain on board of her and do his duty—and his contract with the "Napoleon III." having been dissolved by operation of law, he was a free man, amenable to the laws of this Kingdom, while here, and entitled to the privileges which those laws confer. It must be admitted, from the authorities to which I referred, that the penal laws of France are inoperative here, and it does not come within the rule of the comity of nations to give them force here, for this very course might make us the instruments of doing injustice to others. We are bound to conform to the code of the civilized world, and to our treaty stipulations, which I trust will never do violence to it. And now, what would be the practical working of this application of the Consul of France ? It certainly would be to control the liberty of this man on the ground that he had been attached to the French marine, although he

now is a seaman attached to a foreign ship, and he virtually claims the interposition of our laws to aid him. By treaty, this Government is bound to render all necessary assistance for the search, arrest, detention and imprisonment of deserters from ships of war and merchant ships. The Consul of France does not claim him as a deserter, and therefore we are not called upon to aid him under this provision.

The only remaining treaty stipulation which has reference to the surrender of any person to the authorities of another country, applies to those who, being charged with the crimes of murder, piracy, arson, robbery, forgery, or the utterance of forged paper, committed within their jurisdiction, shall be found within the limits of this Kingdom. De Flanchet is not demanded under this stipulation. So scrupulously have all countries guarded the personal liberty of those within their territory that it is the doctrine generally recognized among nations that, independent of treaty stipulations, no State is bound to deliver up fugitives from justice even upon the demand of a foreign State. Grotius entertained a different opinion, although he says that for some ages past the right of demanding delinquents has not been insisted on in most parts of Europe, except in crimes against the State, or those of a very heinous nature. Puffendorf founds the right of demanding a delivery of the offender on treaty stipulations. Lord Coke in his institutes is strong and positive against delivering up. He refers to a case in which Queen Elizabeth, in the thirty-fourth year of her reign, demanded of the French King, Henry the IV., Morgan and others of her subjects who had committed treason against her. The answer of the King was, " That all Kingdoms were free to fugitives, and it was the duty of Kings to defend every one in the liberties of his own Kingdom." There are other instances where the King of France has declined to surrender. If the practice and usage of States is to admit fugitives and defend them in their liberties, except in cases of special compact, it cannot be expected that we shall aid in surrendering a Frenchman who may have violated a penal law of his own country.

But in this case there are other difficulties and embarrassments than those which appertain to the rights of de Flanchet.

Francis de Flanchet.

He has made a contract on board the American ship "Nassau," and is legally bound to fulfill it. And it is very clearly a case in which an appeal to the comity of this nation cannot be made, for the reason that injustice would be done to the rights of the citizens of another friendly nation. Comity is never exercised in cases of this kind. Indeed, by the principles of international law, it is not to be exercised in doubtful cases, much less when it works injury to the State, its citizens, and especially to the rights of the citizens of a country with whom we have friendly relations. And, indeed, as in this case, with a country with whom we have treaty stipulations that we will render them all needful service in arresting deserters from their vessels. Wheaton says that "the delivering up by one State of deserters from the military or naval service of another, depends entirely upon the mutual comity, or upon special compact between different nations;" and this, although the deserter may have violated a law of vital interest to his State, and subjected himself to the penalty of death. I accord with the doctrine of Huberus, who says, "that by the comity of nations whatever laws are carried into execution within the limits of any State are considered as having the same effect everywhere, so far as they do not occasion a prejudice to the rights of other States and their citizens." This is the objection in this case, that the acquiescence in the view of the counsel for the petitioner would occasion a prejudice to the rights of a friendly nation and her citizens.

Wheaton says that a criminal sentence, pronounced under the municipal law in one State, can have no legal effect in another. It is a sentence of conviction, and it cannot be executed without the limits of the State in which it is pronounced upon the person or property of the offender, and if he is convicted of an infamous crime, attended with civil qualifications in his own country, such a sentence can have no legal effect in another independent State.

This doctrine is sustained by some eminent European writers, such as Martins, Klubec, and Felix.

It will not be contended, says Chief Justice Parke, that foreign judgments upon criminal suits can be executed upon the persons of such fugitives as may be found within our

territory. No one supposes that they can be proceeded against and punished, either in their persons or property, in virtne of a judgment which may stand against them in the State from which they fled. (Commonwealth *vs.* Green, 17 Mass., p. 514.)

Flanchet was in the Kingdom, and legally shipped on board of an American vessel, and it is not a case to which an appeal to the comity of this nation can properly be made. It is not a question in which our citizens have the exclusive interest. If comity is to be exercised, it is to be by those directly interested in this particular case. It would be highly gratifying to the Court if the Consuls of the different nations represented here could arrange by comity any differences which may arise between them; but if they do not, and access is had to the Courts, our duty is to administer to them the law. We have treaty stipulations, and it is our duty to regard them; and to render aid in shielding a seaman from performing his contract would be a violation of our obligations to every nation, especially with whom we have treaties.

I am, accordingly, of opinion that the prisoner must be remanded.