In re Wong Sow on Habeas Corpus.

# SUPREME COURT—IN BANCO.

## APRIL TERM—1873.

*Allen, Ch. J., Hartwell and Widemann, J. J.*

IN RE WONG SOW ON HABEAS CORPUS—APPEAL FROM DECREE OF HARTWELL, J.

A CONTRACT LABORER proceeding from Macao to Costa Rica, his ship touching at Honolulu, may not be detained on board and deprived of the right to come on shore, but stands in the position of a passenger. ALLEN, Ch. J., dissenting.

HARTWELL, J.: A writ of habeas corpus was issued on sworn petition in behalf of the relator, Wong Sow, alleging that he was illegally detained on the Italian steamer Glensannox, in the port of Honolulu, and deprived of the right to come on shore. The cause of restraint alleged by the respondent was a contract between the relator and Messrs. Meigs, Hubbe and Grytzell, made at Macao, whereby he agreed to serve said Meigs, Hubbe and Grytzell, and their assigns for eight years from arrival at Puntes Arenas, in Costa Rica, and acknowledged the receipt of eight dollars and three suits of clothing in advance. The petition alleged cruel treatment on the vessel. There was evidence that the relator tried to talk with some one on shore, and was thereupon beaten and driven down below; that several Chinese on board tried to talk with some one on shore, when a man on board blew a whistle, and "several men with pieces of knotted rope commenced to drive the coolies aft." The relator was ordered to be discharged from the restraint.

At the argument on the appeal, the relator's counsel desired a ruling merely on the respondent's right to retain

the relator in custody, and waived all objections to the contract or on the ground of cruelty.

I have been unable to find legal authority for the restraint shown, by reason of this contract executed in China, to serve in Costa Rica. Our statutory law seems to me to be imperative in requiring the Court to issue the writ and order the discharge.

"The privilege of the writ of habeas corpus belongs to *all men*, and shall not be suspended unless by the King when in case of rebellion or invasion the public safety shall require its suspension." Const., Art. 5.

"No *person* shall be subject to punishment for any offence except on due and legal conviction thereof, in a Court having jurisdiction of the case."—*Ib.*, Art. 6.

"No person shall be deprived of life, liberty or property without due process of law."—*Ib.*, Art. 9.

"The laws are obligatory upon all persons, whether subjects of this kingdom or citizens or subjects of any foreign State, while within the limits of this kingdom, except so far as exception is made by the law of nations in respect to ambassadors or other persons."—Civil Code, Section 6.

"Every person restrained of his liberty (except in restraint under process of Court), may prosecute as of right a writ of habeas corpus according to the provisions of this act, to obtain relief from such restraint, if unlawful."—Section 1, Habeas Corpus Act of 1870.

"The Court or Justice to whom such complaint shall be made, shall without delay award and issue a writ of habeas corpus."—*Ib.*, Section 4.

"If no legal cause for the imprisonment or restraint shall be shown, the party shall be immediately discharged therefrom."—*Ib.*, Section 21.

By certain treaties we are bound to give up on official request by the Treaty Powers, persons accused of certain crimes and deserting seamen. The present case comes within none of these requirements.

There are no statutes which declare that the privilege of habeas corpus may be denied· to persons en route for other countries, or that foreigners may use any forcible restraint on each other here which subjects cannot also use., I do not know by what authority the Court can declare that such privilege may be denied, or such power held by foreigners which is denied to subjects; but the clear and strong language of our Habeas Corpus Act prevents, as I think, any judicial discretion in the matter.

I see no way to avoid discharging the relator from the restraint upon his person. This is not a suit in equity wherein relief may be refused if the Court suspect it to be desired as a means of escaping legal obligations. If a creditor seek to hold his debtor's person as security for debt, or to prevent breach of contract, I do not know how a Court can say that the restrainst shall continue because the debt may otherwise be lost. On the contrary, the creditor must rely on his legal remedy, and would not be permitted to use his own personal force. Public imprisonment for debt is everywhere strictly a matter *lex fori;* whether Costa Rican law permits this class of contracts to be enforced *in personam*, or not, I do not know; but if such be the law there, and if the relator be legally bound to proceed there to perform his contract, that gives no right of private coercion.

Nor is this a master's complaint of his servant's willful desertion, under our masters and servants act. If it were, then complaint of cruelty and objections to the contract itself which are now withdrawn, would be in point. And if the servant under such a complaint were adjudged guilty, or ordered back to service, he might prefer public imprisonment, and no bodily compulsion could legally be used to make him return.

Finally, this is not an Admiralty case, in which a Court could decline jurisdiction on the ground that the cause of action arose abroad, and that the foreigners could be sent

64

home for justice. This is a tort upon the person, committed within the geographical jurisdiction of this Court. Had the relator sued for damages for false imprisonment, or assault, or if a public prosecution therefor had been instituted, a plea to the jurisdiction could not have been verified by the facts of the case, for the parties and the act were here.

Regarding our enacted law as peremptory over the case, I have not considered the policy of applying it. But I do not apprehend more danger to the community in the law which precludes private forcible enforcement of contracts, than would result if such private force were permitted. If private armed vessels can keep men, not seamen, in such restraint at our wharves, and Hawaiian police are to be posted to prevent intercourse with the shore, the same thing can be done on the land. I think it is wiser to have the same law for all persons here who are not exempt by treaty or international law.

In Flanchet's Case, 2 Haw., 96, the French Consul claimed by habeas corpus a French subject shipped as a seaman on an American vessel. The claim was rejected, the Court declining to enforce French law on the subject of the shipment of French sailors, and citing the answer of Henry IV. of France to Elizabeth, that "all kingdoms are free to fugitives, and it is the duty of Kings to defend every one in the liberties of his own kingdom."

In Roberts *vs.* Knights, 7 Allen, 449, the Court gave judgment to a British sailor, who had deserted his ship, for wages on a British vessel, and declared the shipping articles void for indefiniteness. The Court in that case said, "it is consonant to natural right and justice, that the Courts of every civilized country should be open to hear the causes of all parties who may be resident for the time being within its limits."

France once declined jurisdiction of suits between foreigners, "in which respect," says Fœlix, "French law

differs from that of almost all other civilized countries." I understand that their law is now so modified as to admit foreign suitors. See 4 Am. Law Rev., 607.

English Courts have even refused to deliver up a ward to the custody of a Scotch guardian. Bell's Camp. Eng. and Sc. Law, 454. American Courts discharge on habeas corpus apprentices claimed under English indentures. Com. *vs.* Deacon, 6 S. and R. 525. Com. *vs.* Hamilton, 6 Mass. 273.

Our law permitting labor contracts to be enforced penally does not include contracts of foreign labor. A Hawaiian employer would not obtain the aid of English and American Courts for the enforcement of a labor contract by our law, and he would be liable to the law there if he used force of his own to compel the service. 1 Hurd's Law of Freedom and Bondage, 139. Cooley's Const. Limits, 342. Viner's Abr., Title Master and Servant, K. 2 Hagg. 133. 18 Pick. 192.

To subjects and citizens of treaty powers, we are bound to extend "the same privileges, liberties and rights as to native subjects." Art. 9 Brit. Treaty. Art. 8 Am. Treaty, and other Treaties. Can those with whom we have no treaty complain if we allow them no less and deny no more ?

If an English Australian steamer were to touch here with English emigrants under contracts to labor in California, would it be claimed that force could legally be used to prevent such passengers coming on shore ? The law in the two cases is the same.

The following citations are made in addition to the foregoing :

1 Black. Comm. 134, and 3 *Ib.* 127. 9 Bacon's Abr., 462. Wharton's Confl. Laws, §§ 744, 749. Story's Confl. Laws §§ 541 and 574, *a.* 2 Phillemore's Int. Law, 2 and 4, *Ib.* 2, 15, 702, 706. 1 B. and Ad. 288. 3 Inst. 180. 23 Deut. 15.

As the majority of the Court do not find legal cause for the restraint, the decree discharging the relator therefrom is affirmed.

---
In re Wong Sow on Habeas Corpus.
---

WIDEMANN, J.:   Wong Sow comes before the Court in this case with the allegation that he is illegally deprived of his liberty by being detained on board the Italian steamer Glensannox.

The captain of the steamer admits the detention, but claims that he has the right to detain the said Wong Sow under a written contract of service, made in Macao, to be executed in Costa Rica, which Wong Sow admits he had executed.

The language of our Habeas Corpus Act, in Sections 1 and 4, is peremptory, and it was obligatory upon the Judge to whom the petition was addressed, to issue the writ.

Section 21 of this Act provides: "If no' *legal* cause for the imprisonment or restraint shall be shown, the party shall be immediately discharged therefrom."

Is this contract then a *legal* cause for the detention ?

Our laws do not give the subjects of this country any such rights to restrain their servants under similar circumstances, and a foreigner cannot claim rights that do not inure to the subjects.

I hold that the detention of Wong Sow was illegal, and that he should have been immediately discharged therefrom.

ALLEN, Ch. J., dissenting:  This is an application of Ah Foo, of Honolulu, in behalf of Wong Sow; and Ahou, of Honolulu, in behalf of Ang Ye; and of Sam Quoy, of Honolulu, in behalf of Ah Fat, for a writ of habeas corpus.

The petitioners set forth that the persons above named in whose behalf they appear, are on board the Italian steamer Glensannox, lying in the port of Honolulu, and they are desirous of coming on shore, but are forcibly restrained of their liberty, and they desire that this complaint may be investigated and such further order made in the premises as the case may require.

At the hearing, two of the parties expressed a desire to

return to the steamer, and they did so, and the case of Wong Sow only is presented.

It appears that Wong Sow entered into a contract in Macao, China, with the Agent of certain parties residing in Costa Rica, Central America, to embark on some ship to be furnished by them to proceed to Punta Arenas, Costa Rica, and there perform service in the fields or in the household, for the period of eight years for agreed wages, and certain advances in clothes and money and a passage to Costa Rica, at the expense of the contractors.

It appears by the contract, that it was made in the presence of certain officials of the Colony of Macao, one of whom was the Superintendent of Emigration, and duly attested by the Italian Consul. It is admitted that the contract is reasonable in its terms, and it is not denied that it was fully understood. Having received eight dollars in advance, and a suitable amount of clothes, he embarked on board the steamer for Costa Rica. There were some six hundred persons who embarked on the same steamer, under similar contracts. The steamer put into this port for provisions, water, and whatever was necessary for refreshment. She remained here several days, and on the eve of her departure the petitioner made application for a writ of habeas corpus, alleging ill treatment, and the same was issued. It appears that he did not make an application to go on shore, and if he had, it is admitted that he could not have been permitted to have gone, as the steamer was soon to leave port.

I understand it to be admitted by the counsel for the petitioner that the contract was legal and proper in its terms, and that the steamer furnished suitable accomodations, and that there was no evidence of ill-treatment, but he contends that the petitioner had a right as a passenger, to come on shore when the vessel arrived at the wharf for any purpose he might think fit, and that the restraint put upon him was unlawful.

It is a matter in which two friendly nations are interested. The ship is chartered at great expense, and large advances in the aggregate are made, not only to the men, but for provisions and supplies for the voyage. It is apparent from the evidence that there was no dissatisfaction on board, and that Wong Sow was induced by influence from persons on shore to make this application. Two other persons on board made the same application with Wong Sow, but at the hearing expressed a wish to return to the ship, and did so. This act of these men is strong evidence of comfortable accommodation and good treatment.

It is an admitted principle, says Mr. Justice Story, that a nation ought not to make its own jurisprudence an instrument of injustice to other nations, or their subjects.

Let us apply this principle to the case submitted to us. Contracts are made at Macao with some six hundred persons to embark for Costa Rica, and there perform labor for a specified period for wages agreed upon, with suitable clothing to be furnished the parties, and advances made on the wages. In addition to this, large disbursements are made for the charter of a steamship, that the voyage may be made expeditiously, and the necessary amount of provisions are supplied. On her passage she touches at this port for fresh provisions and for the general comfort of all on board ; under these circumstances is it in accordance with the principles which govern the conduct of nations to take these people from the ship and put them on shore at their own will, when it is admitted that there was no cause of complaint ? or should the parties be remitted to the home from whence the contract was to be executed, for the adjudication of their rights ?

As in the case of Admiralty jurisdiction, the Court will not take cognizance of the cause, if justice would be as well done by remitting the parties to their home forum.—Parsons on Maritime Law, 2 vol., p. 543.

The foreigner is not entitled to invoke the power of the

Court as a matter of absolute right.—Abbot Ad. R., 131.

When the Court is satisfied that justice requires its interposition in his favor, these powers will be exercised.

The authorities, both English and American, fully sustain the doctrine of the power of the Admiralty Courts to entertain suits between foreigners, while at the same time its exercise is discretionary with the Court. If it is a case of special necessity to prevent a failure of justice, the duty is imposed to exercise the jurisdiction.—2 Haw. Rep., Enos *vs.* Sowle, 336.

In the case of Johnson *vs.* Dalton, [1 Cowan,· 543,] the Court say : "Our Courts may take cognizance of torts committed on the high seas on board a foreign vessel; but on principles of comity, as well as to prevent the frequent injuries that would result, they have exercised a sound discretion in entertaining jurisdiction or not, according to circumstances."

There are nations which generally refuse to take cognizance of controversies between foreigners, and remit them for relief to their own domestic tribunals. This is the general usage in France upon subjects of controversy arising abroad. This Court regards it a duty, however, to exercise jurisdiction when there is a special necessity, to prevent a failure of justice.

Is there any special necessity in this case for the interposition of this Court? If there was any evidence of ill-treatment or a want of suitable accommodation on ship board, the Court would certainly interpose; but as these reasons do not exist, and the voyage by steam to Costa Rica is but a few weeks, they regard it their duty to conform to the usage of nations, and leave the parties to their rights and remedies at their home forum. Wong Sow cannot complain of this, for he freely embarked on the steamer for Costa Rica to perform a certain contract there which had been agreed upon at Macao. The contract accords in principle, although not

in all its details, with those made under the laws of this kingdom. Contracts have been made in China by the agents of this government, and vessels chartered for the passage of the employees to this kingdom at large expenses, as in this case, and suppose the vessel had touched at any intermediate port for provisions and water, or from stress of weather, and the Court there had interposed and set them at liberty, would it not have been making their own jurisprudence, as Mr. Justice Story says, an instrument of injustice to this kingdom?

In the case of Holmes *vs.* Bemsen, [4 Johns, Ch. R.,] Chancellor Kent says: "The mutual respect of nations, as Huber terms it, or courtesy of international law, is founded on the credit which one country gives to the administration of justice in another, and the adoption of it wonderfully increases reciprocal confidence and credit." As the parties are foreigners, one of whom resides at Costa Rica, and the other is bound there to fulfill a contract, it is not in accordance with the usage in any country to assume jurisdiction in such a case, when there is no cause of complaint. And the Chancellor further says that the true question is, "whether it be not wise, and politic, and just, when no positive law intervenes, and when it is not repugnant to the essential policy and institutions of the country, to adopt the rule of international law which other nations apply to us, and which impairs no rights, but promotes general justice, and is founded on the mutual respect, comity and convenience of commercial nations." *Ib.,* 472.

Wong Sow and others, by the contract they made, induced these parties to charter a steamer and to provide provisions for the voyage, and to make them advances in money, and to supply them with clothing, all of which amounts to a very large sum, and now this Court is invoked to aid them to commit a great wrong, when it is not pretended that there is any ill-treatment or want of proper accommodations or suita-

ble provisions for the voyage. If it is regarded as imperative in the Courts to assume jurisdiction in these cases, it might be in its results dangerous to the peace of the kingdom to permit so large a body of men to come on shore without means to supply their necessary wants. All countries are cautious about exercising jurisdiction on passengers who are *in transitu* to their own country and from their own country to another country. It is the general principle of comity to remit the parties to their home forum. In this case the voyage is not long in time by steamer to Costa Rica, and it is not contended that the party would be likely to suffer on the voyage.

It is only in extreme cases that Courts will exercise jurisdiction over foreigners *in transitu* to a home port, or port of destination. It is not pretended that not to exercise it would be a denial of justice. In this case, as the contract is to be performed at Costa Rica, of course it is the only place proper for its adjudication, and I do not regard it as a matter of sound legal discretion for this Court by its interposition to enable either party to escape his legitimate obligations, as would be the case should the man be discharged here.

In this connection it may be well to refer to a convention concluded on the 8th day of September, 1870, between the King of the Netherlands and the Queen of the United Kingdom of Great Britain and Ireland, to facilitate the emigration of free laborers from the British territory in India with the Dutch colonies in Surinam.

I refer to this convention to show that Great Britain recognizes contracts of this character, and authorizes them to be made, and the parties to embark for the country where the contracts are to be executed, and of course she would sustain the rights of the ship-owners, and the parties interested in the contracts, and give them under her laws safe convey to the place of destination.

Supposing any British vessel should come into this port

65

from any of the dominions with parties under these contracts, when, as in the case at bar, there were satisfactory accommodations and good treatment, the British Government would be bound to enforce restitution to the parties in interest, if our Courts should interfere and discharge the persons on board by habeas corpus without the cause already adverted to.

If the petitioner had been abducted from the country, and was on board of a vessel known as a coolie vessel, so called, I should discharge him at once. But he made his own contract freely and without restraint, and perfectly understood its terms and conditions, and had on board of the steamer satisfactory accommodations and good treatment.

The laborers of China and India can improve their condition by coming to these islands, and many places on the continent, and it is not a humane policy to throw impediments in the way of their migration. They should be carefully protected, and be made to fulfill their reasonable contracts, and then respectable parties will engage them and incur the large expense of their transportation and necessary advances.

It is for their comfort and health that the steamers should call here for fresh provisions, rather than to make the long voyage from China without them.

The articles of the Constitution are referred to as sustaining a contrary doctrine. For example, Article 9 contains a provision that "no person should be deprived of life, liberty or property without due process of law." This does not refer to seamen shipped on foreign vessels, neither is it designed to compel the Court to entertain jurisdiction in every case of foreigners calling here, en route to some other country.

In the case at bar, neither party is temporarily resident here ; and no sudden occasion has arisen for trying this controversy here.

Mr. Justice Curtis says, in the case of Browne *vs.* Ducheone, 2 Curtis, C. C. Rep., that in the absence of proper legislation this country (United States) and in England, Courts of Justice have exercised the power of determining in what cases and to what extent it is the will of the nation not to extend to foreigners or their property the municipal laws which in similar cases govern our citizens.

He cites the case of the schooner Exchange, [7 Cranch, 116], in which it was decided that a public armed vessel of a sovereign at peace with the United States is not within the jurisdiction of any of our tribunals while lying in a port of the United States.

He adds in the same decision, that the 29th Section of the Collection Act of 1799, (1 Stat. at large, 648), authorized the seizure of any vessel which, having arrived within the limits of any district of the United States from any foreign port or place, should depart or attempt to depart before making report or entry. A vessel arrived in the River St. Mary's, whose waters belonged in common to the United States and the King of Spain ; she was not bound to the United States, but was undoubtedly within the limits of its collection districts and fully within the words of the Act. There could be no doubt of the power of the United States to compel an entry, if it had seen fit to exert it. But it was held that such an assumption of jurisdiction was not intended and that the seizure was not lawful.—The Apollan, 9 Wheat., 362.

This is the case referred to by Vattel, vol. 2, chap. 8, sec. 103, where after saying that disputes arising in the country of the forum between a stranger and a citizen, or between two strangers, should there be determined. He adds that the defendant has a general right to have the dispute heard by the tribunal of his domicile.—Story, Conf. Laws, §§ 532, 541, 542.

In the case of bark Havana, Sprague, 402, the Court says : " This is a libel against a British vessel by a British subject

domiciled abroad. In such case the Court may exercise jurisdiction, but it is not bound to do so.''

Mr. Justice Story says in the habeas corpus case of Harvey *vs.* Richards, 1 Mason, 409, ''that Courts of Equity ought not to be the instruments of injustice, and that if in a given case such would be the effect of its interposition, it ought to withhold its arm.'' This principle is applicable to the present case. It is not denied that injustice will be done innocent parties, but it is contended that there is a legal compulsion to do so at this time and place. There is certainly no statute as applicable to this case, and the authorities cited do not refer to a case precisely like this. Massachusetts has her own laws which regulate the course of judicial proceedings and the principles which should govern her Courts; but she is not the sovereign power of the country, and her decisions might very probably be different from the Court of the United States, which has the only responsibility in relation to offences with other countries.

The question in this case is, was there any legal cause of restraint? Our law recognizes the validity of the contracts, under which this view was held, and that imposes a restraint if the party violates the contract. Now in this case, he was seeking to evade his contract by going ashore on the eve of the departure of the vessel, and it was a restraint not in violation of law, unless there were other reasons, such as cruel treatment, which is not pretended in this case.

If the contracts were to be executed here the man would be responsible for its fulfillment, and if he refused to do so, he would be liable to imprisonment, and we must extend to foreigners *in transitu* the same protection which is secured to our citizens.

Mr. Justice Story says: ''The rules which should be observed between nations are those which arise from mutual interest and utility, from a sense of the inconveniences which would result from a contrary doctrine, or from a moral neces-

sity to do justice, in order that justice may be done to us in return." Story's Conflict of Laws, p. 34. "It is," as Mr. Justice Story remarks, "in the strictest sense, a matter of the comity of nations, and not of any paramount obligation, superseding all discretion on the subject."

"All countries are cautious about exercising jurisdiction in cases between foreigners who are *in transitu* to their own country, or from their own country to another country." It is the universal practice to remit them to their home forum, unless it is such a case of injustice to do so. In the case of Enos *vs.* Sowle, 3 Haw. R., there was a protest against the jurisdiction of the Court by the American Consul, but it was exercised because the allegations were alleged and proved of the grossest abuse on shipboard, and it was uncertain when the vessel would reach a home port, and the plaintiff would be subject to the same abuse, perhaps, during a long voyage, and on arrival it would be doubtful whether the witnesses necessary to sustain the allegations would return on the vessel, and therefore it would have been a denial of justice to have remitted the parties to the home forum. In this case, the circumstances are entirely different; Wong Sow is in comfortable circumstances on board, and the voyage to Costa Rica is a few weeks, and all the witnesses which would be required here, he will have there, therefore, my belief is, that the Courts of all countries would decline to exercise jurisdiction in such case unless it should be proved that the party was unjustly treated. It is not pretended that not to exercise jurisdiction would be a denial of justice.

A foreigner has not the right to demand the exercise of a jurisdiction of the Court which might involve the government in serious diplomatic questions for doing damage to the citizens of countries on friendly relations with us, as well as letting loose upon our shores a large number of people who may occasion serious trouble. The home forum is the proper tribunal for foreigners to litigate their cases, and for a

foreign Court to interfere when in a few days the parties can have that advantage, is not in conformity with the usages of nations. It is better and wiser to let foreigners stand by their agreements and settle them under their own laws and by their own tribunals. The law will not aid a man in the violation of a legal contract; but in the case under consideration the case is far stronger; his contract is to be performed at or near the port of destination; heavy expenses are incurred for him, not only in preparation for the voyage but in procuring a vessel for the home port.

Suppose, for illustration, that all these persons are discharged from the vessel and put on shore, the consequences to the charterers and the party from whom they have received heavy advances may be ruinous.

The Court is not invoked to aid in enforcing the contract, but in defeating it, but not even on its merits. Wong Sow comes into Court for relief, when it appears that he with many others induced the charterers of a steamer at very heavy expense to engage them a passage from Macao to Costa Rica, where they were entitled to their pay on arrival, and at this port, when the voyage is more than half accomplished, they attempt to leave the steamer and thereby prevent the charterers from receiving their passage money, and the contracting parties their heavy advances, and to commit this gross fraud, he invokes the aid of this Court.

Let them all go to Costa Rica and seek redress there. It is a case for their Courts to decide and not for ours. Besides, we have a duty to perform to the government under which we live. If Wong Sow has a right to a discharge, all on board under similar contracts have the same right, and to land six hundred people here, without means of support, might be a serious evil, not only in raising serious diplomatic questions but in disturbing our domestic peace.

E. Preston for the relator.

C. C. Harris for the respondent.